1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF TEXAS

3                    WACO DIVISION

4  FINTIV, INC.                    *
                                   *
5  VS.                             * CIVIL ACTION NO. W-18-CV-372
                                   *
6  APPLE, INC.                     *   August 29, 2019

7     BEFORE THE HONORABLE ALAN D ALBRIGHT, JUDGE PRESIDING
                    PENDING MOTION HEARING

8  APPEARANCES:

9
   For the Plaintiff:           Andy W. Tindel, Esq.
10                              Mann Tindel Thompson
                                300 W. Main St.
11                              Henderson, TX 75652

12                              Jonathan K. Waldrop, Esq.
                                Kasowitz Benson Torres LLP
13                              1349 West Peachtree Street N.W.
                                Suite 1500
14                              Atlanta, GA 30309

15                              Heather S. Kim, Esq.
                                Kasowitz Benson Torres, LLP
16                              333 Twin Dolphin Drive, Suite 200
                                Redwood Shores, CA 94065
17
                                Justin Allen, Esq.
18                              Haley & Olson, P.C.
                                100 N Ritchie Road, Suite 200
19                              Waco, TX 76712

20 For the Defendant:           J. Stephen Ravel, Esq.
                                John R. Johnson, Esq.
21                              Kelly Hart & Hallman LLP
                                303 Colorado, Suite 2000
22                              Austin, TX 78701

23                              Travis Jensen, Esq.
                                Orrick, Herrington & Sutcliffe LLP
24                              1000 Marsh Road
                                Menlo Park, CA 94025-1015

25

```
1   Court Reporter:              Kristie M. Davis
                                 United States District Court
2                                PO Box 20994
                                 Waco, Texas 76702-0994
3

4        Proceedings recorded by mechanical stenography, transcript

5   produced by computer-aided transcription.
```

1  (August 29, 2019, 9:04 a.m.)

2      THE BAILIFF:  All rise.

3      (Call to Order of the Court)

4      THE BAILIFF:  Please be seated.

5      THE COURT:  Good morning, everyone.

6      DEPUTY CLERK:  Pending motion hearing in Civil Action

7  W-18-CV-372, styled Fintiv, Incorporated vs. Apple,

8  Incorporated.

9      THE COURT:  Good morning, ladies and gentlemen.  If you

10  all would be so kind as to introduce yourself on the record and

11  let me know who's going to be speaking primarily.

12      Mr. Tindel, good morning.

13      MR. TINDEL:  Good morning, Your Honor.  Andy Tindel.  I'm

14  here on behalf of the plaintiff Fintiv, Inc., and with me this

15  morning is our lead counsel Jonathan Waldrop and with his firm

16  Heather Kim and we also have Justin Allen from the Haley Olson

17  firm, and Mr. Waldrop will be making the argument for the

18  plaintiff this morning.

19      THE COURT:  Very good.  Thank you.  And welcome back.

20      MR. WALDROP:  Thank you, Your Honor.

21      THE COURT:  Mr. Ravel?

22      MR. RAVEL:  Your Honor, Steve Ravel from Kelly Hart

23  Austin.  Pleased and proud Apple, Inc.  On my team today is the

24  brains of the operation J.R. Johnson, Travis Jensen from the

25  Orrick firm.  Sven Stricker is on graphics today, and from the

1  client is Jessica Hannah and Natalie Post, and I will be making

2  the argument primarily.

3      THE COURT:  Very good.  Thank you.  So are you going to be

4  starting, Mr. Ravel?

5      MR. RAVEL:  I am.

6      THE COURT:  Mr. Ravel, when they heard you were speaking,

7  all my clerks, we had a lottery.  I could only let two of the

8  three in here and these two won, and one is having to sit in

9  the back and actually keep working, but these two paid the most

10 money to get to come out and watch you.

11     MR. RAVEL:  Well, we can pipe it back for them.

12     (Laughter.)

13     THE COURT:  Suzanne?

14     (Off-the-record discussion.)

15     MR. RAVEL:  Thank you, Judge.  I hope I'll live up to

16 that.

17     May it please the Court.  May I begin by saying that Apple

18 believes strongly that this case belongs in Northern

19 California, and to that end the Orrick firm put together a

20 beautiful record of facts that I will be previewing and

21 discussing with you here today.  It puts the front guy in the

22 enviable position of having a slide deck that has a record

23 reference for every factual assertion it's made in it and it

24 allows one to be kind of an unequivocal and active voice

25 without talking loud and waving their arms.

1    So what will the proof be at trial and where will that

2   proof come from?  And I think the subheading on that is if this

3   case was tried next Monday on these contentions, who would be

4   Apple's witnesses to rebut infringement and to disprove

5   damages?  So that's going to be the theme of my argument here

6   today, Judge.  If this trial was heard Monday on these

7   contentions, who would be the witnesses?

8    Your Honor, I'm going to talk about the accused technology

9   in a little bit of detail in a minute, but a very large part of

10   it is -- of the structures is provided by a third party called

11   NXP, and that's one of about four acronyms I'll be using

12   probably sparingly.

13    But NXP witnesses who will be very important are in San

14   Jose beyond the subpoena power of this Court which, as you can

15   see, I'm going for a private factor two argument.  I think it

16   is the perception in the bench and the bar now that that is the

17   most important factor, and I will be stressing it quite a bit.

18    THE COURT:  And let me just put on the record, I think I

19   may have told you all, but in the past I represented Apple and

20   in the past I represented Freescale which I think became NXP.

21   I'm not sure about that, but I never represented NXP, but both

22   of those representations were quite awhile back and no one has

23   seemed to be bothered by it, but I just wanted to have that on

24   the record.  So...

25    MR. RAVEL:  Your Honor, all of Apple's witnesses who would

1    testify against infringement and against damages are in

2    Cupertino or thereabouts.  All the physical proof, including

3    source code, would be out there, and there are other possible

4    third parties.  There's a back end banking aspect of this

5    because it's about loading credit cards onto iPhones and

6    iWatches, and some of those witnesses may be out there too.

7    And if we understand the record correctly, there are two Fintiv

8    local witnesses, neither of which claim any knowledge about the

9    accused technology.

10        All right.  Since we're going to talk about what the trial

11   would look like, I think it's important to look at the patent

12   and Fintiv's complaint about how the patent was infringed.  The

13   abstract of the patent, a method for provisioning and I think

14   that means siding up, putting into the system a contactless

15   applet in a mobile device with a mobile wallet application.  In

16   other words, how does my daughter load my wife's American

17   Express card onto her Apple phone 10 and her Apple watch?  That

18   is what this trial is about is how an Apple customer loads a

19   credit card onto a device.  And there's a fairly technical

20   string of procedures and steps through that, but that is the

21   common sense -- the common sense summary of what the lawsuit is

22   about, and that is completely consistent with what plaintiff

23   says in their pleadings when they describe the patent-in-suit.

24   It discloses provision, adding in the information to a

25   contactless card mobile device with a mobile wallet

1  application, and it is the loading of the credit card number

2  and the storing it safely that's involved here.

3      And I think a good way to project and to prognosticate

4  about what the trial will look like, which is the most

5  important thing we're doing here, is to run through a

6  representative claim from the preliminary infringement

7  contentions that the plaintiff favored us with, and let me be

8  the first to say that Apple seriously disputes everything that

9  they're saying, and I would refer to these as noninfringement

10 contentions, but they are their infringement contentions, and

11 what I'm going to be talking about is the proof that is going

12 to be necessary to fight infringement and an amount of damages

13 here.  So a mobile device.  Pretty picture.  IPhone, iWallet.

14     Now, in the next slide we have a claim element of a

15 secured element, an SE, and as the proof will show in this

16 case, and I will try to describe as best I can, almost all of

17 the structures that are in issue here are inside that SE which

18 is provided by the third party NXP, and let's talk about what

19 NXP swears who the witnesses will be and where they are

20 domiciled.  And so the claim element is a secured element.

21 They say there is one.  Let's see who provides it and where it

22 comes from.

23     NXP provides it, a third party.  They have the fancy

24 acronyms of NFC and NFC component, but I think I'm going to

25 stick with SE because it's the shortest and the simplest.  The

1    SE which contains everything else is provided by a third party.

2    It has some witnesses that are out of the country which would

3    be neutral because neither court could compel them to show up,

4    but a theme I'm going to stress quite a bit, maybe to the point

5    of overkill, is that the NFC witnesses who interact with Apple

6    on a day-to-day basis are in San Jose.  So you see where we're

7    going here.  The Apple defensive witnesses are in Cupertino and

8    they interact with third party witnesses in San Jose.  No tie

9    to Austin.

10    And let's go through the proof laid over the claim

11    elements very briefly.  Glen Steele will be an important

12    witness at this trial or a member of his group.  He's the head

13    of the group.  He has engineers who work with him.  The proof

14    is clear that an abundance of those, a plurality, almost all

15    are in Cupertino and that none are here.  Mr. Steele is the

16    source code guy for the ongoing administration of the accused

17    product.  He's the source code guy for phone.  He works in

18    Cupertino, his group is in Cupertino, and not highlighted but

19    the design and the development of the Apple watch source code.

20    So he's a cradle to grave witness.

21    We'll go quickly through this slide because it is the

22    mirror image for watch.  Greg Novick is the Mr. Steele for

23    watch, developing, maintaining and updating the device side

24    Watch operating system.  Him or a member of his group is going

25    to be pretty important.

We're going to toggle back now for one slide to the importance of the NXP witnesses.  Mr. Tackin, a secure element engineer and that he -- that his team interacts with NXP design teams in Europe and in Northern California.

David Brudnicki is the liaison with the outsiders like at financial institutions.  Could be an important witness.

Chris Sharp is the source code guy for the servers where that information is securely stored.

So where we're going with this, Judge, is this case is about device side, server side, watch, wallet, and the people who will defend us are in Cupertino and the third party witnesses who will provide information to the extent that they're in the United States are in San Jose.

Moving away from noninfringement proof and moving over to the building blocks for the lack of damages.  The marketing people are in San Jose -- in Cupertino.  The people who know about licensing and finance are in Northern California.

Okay, Judge.  Interim summary of what I have said so far.  There are individuals from Apple who are all resident in Cupertino nearby, are nearby, and NXP people who are in San Jose who will be key to Apple's defense here.  And I venture to say if this trial was next Monday on these contentions, Apple would not call a Texas resident as a defense witness based on what we know now.

What does Apple do in Austin?  Pleased and proud to be

1    here.  Think we're a good member of the community, a good

2    productive member of the community.  This is Judge Sparks' yoke

3    and egg thing, and I guess one goal I have here today is to do

4    a half a good as job as whoever Apple was using in that

5    Dataquill case.  6,000 employees and growing.  A theme that

6    Fintiv might come up with is that we get corporate welfare in

7    the way of tax abatements, and I prefer to take a more

8    capitalist view of that and a more populus view, and is that

9    the people's elected representatives have decided that Apple

10   can contribute to the community more by enhancing it rather

11   than paying property taxes, but I don't think it's fair to

12   characterize it as if you're getting corporate welfare

13   somewhere you ought to be able to be sued there every time.

14       What does Apple do in Austin?  And I don't know where he

15   came up with that yoke and egg thing.  I don't know what the

16   egg is.  So this is either just in the egg white or out of the

17   egg altogether.

18       And customer support, lots of people on the phone in

19   headsets, human resources, corporate sales, finance and

20   accounting and some completely unrelated hardware engineering

21   out of the egg in the white, not in the yoke.

22       Your Honor, I'm going to come back to this slide.

23       THE COURT:  And that's 16?

24       MR. RAVEL:  16.  I'm going to talk about 17 before I talk

25   about 16.

1        Let's show our -- let's pay our attention to the last line

2   of 17.  NXP would not offer anyone in Austin as a witness on

3   the functionality or technical aspects of the NFC components

4   used in the Apple products in this case.

5        He makes the collateral point, tries to connotate the

6   position, rebuts the position that Fintiv is taking that

7   because NXP acquired Freescale and Freescale is big in Austin,

8   that that makes some difference, but an NXP witness, this

9   witness from NXP says the companies are still separate and the

10  Freescale people are doing what the Freescale people are doing

11  and were doing and the NXP people, the legacy NXP people are

12  doing what they were doing, and he swears, raised his hand to

13  God and says that they would not offer an Austin witness.

14       So let's go back to 16.  And this is a snip from Fintiv's

15  response.  NXP software engineers, hardware engineers,

16  designers, business developers, product marketers and

17  salespersons will have relevant knowledge about the technology

18  accused in this case and they're expected to provide testimony

19  that supports Fintiv's allegation concerning how the NFC

20  controller, all provided by NXP, in phone and watch infringe

21  the '125 patent.

22       And I hope we have convinced you that those NXP witnesses

23  are not in Austin, and to the extent they're not in Europe,

24  they're in San Jose.  So the best source I know that they're

25  important is a pleading from the other side they are important.

1  They're in San Jose and this case needs to be in a court where

2  these third parties are within the subpoena power of the Court,

3  with respect.

4      Your Honor, the law section of this argument is going to

5  be blessedly short, and part of the reason for that is --

6      THE COURT:  May I interrupt you for a second?

7      MR. RAVEL:  You certainly may.

8      THE COURT:  And I'm not sure where the law -- because

9  you're about to get to the law.  With respect to all the

10  gentlemen -- and I think it was all gentlemen.  Maybe -- I

11  didn't see any --

12      MR. RAVEL:  No ladies --

13      THE COURT:  Okay.

14      MR. RAVEL:  -- in this case.

15      THE COURT:  With respect to the gentlemen that you

16  reference in this case either at NXP or at Apple, do any of

17  them come as part of their -- not just because they may have to

18  go for a certain reason, an odd reason, but do any of them on a

19  regular basis have to come to Texas as part of their job?

20      MR. RAVEL:  No.

21      The reason the law section can be blessedly short, Judge,

22  is that the law firm of Yeakel, Pitman and Albright with Nowlin

23  and Sparks as of counsel and Andrew W. Austin, United States

24  magistrate judge, senior counsel, have been very prolific in

25  this area.  So we have a Western District jurisprudence that is

1  guided by Fifth Circuit and Federal Circuit jurisdiction.  So I

2  find myself in the enviable position of not talking orally

3  today about any cases that come other than from the Fifth

4  Circuit, the Federal Circuit and the Western District of Texas.

5  I think that's a first for me.

6      Beginning on Slide 18 which is where we are now which is

7  tried and true Genentech which cites the Fifth Circuit I think

8  in Volkswagen.  I think this is a factor that's in transition,

9  Judge.  The Fifth Circuit, the Federal Circuit say that pure

10 convenience, missed time from work, travel expense are still

11 important, and I think we have to be guided by that.  If

12 they -- if they think an Apple witness coming from Cupertino to

13 Austin to testify is something that should be avoided by

14 transfer, I think we follow that.  So it is still -- this whole

15 area is evolving as documents get easier to produce in other

16 places and travel gets easier.  I will admit that the non

17 factor two things are in a little bit of transition, but I

18 think we need to ground ourselves in what the Fifth Circuit and

19 the Federal Circuit and the courts of this district say, and

20 I'm going to go through it very quickly.

21     THE COURT:  Yeah.  I guess you touched on something and

22 I'm pretty sure that you and I and Mr. Tindel and Mr. Mort

23 who's in the back and others have discussed outside of the

24 context of this hearing and more generically is where the law

25 is going with respect to companies like Apple or NXP where

1   travel for their employees is pretty standard.  You know, in

2   our day when we started, it was a big deal to fly to Dallas for

3   a day to have a hearing, and now --

4       MR. RAVEL:  In our day, Judge, you had to go to Dallas

5   first when you died.

6       THE COURT:  Well, and there was a smaller airport that you

7   flew out of, but, you know, I'm -- I would be interested in you

8   touching on what I do with the reality that all these

9   companies -- I have a feeling you could run a small nation on

10  what Apple and NXP spend in routinely having their employees

11  spend the night somewhere other than Cupertino as a regular

12  part of their business, and I'm not saying it -- you're right

13  that I'm not -- I was -- I'm told I'm not supposed to be making

14  law in this position, and I don't really plan to, but I think

15  we all recognize, and I've got really smart lawyers here to

16  take advantage of, the idea that an Apple or an NXP employee

17  would have to travel to Austin or Waco or wherever, Pittsburgh,

18  for a trial it seems to me is it's not -- is out of the

19  ordinary for what Apple and those companies do every day anyway

20  in their business.

21      MR. RAVEL:  Your Honor, I have a big advantage in entering

22  into this Socratic dialogue with you about Factor 3 because

23  when you are standing up with what I believe is an extremely

24  compeling case on the gold standard, Standard No. 2, which I

25  would venture to say I probably should have sat down after I

1   talked about how strong Factor 2 is.  Maybe I will after I say

2   what Yeakel said about that.

3       But so I have that big advantage is that I might not be

4   giving up as much as some people would be because I've got that

5   safety net, but I do have -- I do have what I think is an

6   answer and it's kind of in like three parts.

7       THE COURT:  Okay.

8       MR. RAVEL:  Is, yes.  Everything is getting easier.  Yes,

9   the Federal Circuit and the Fifth Circuit still say those

10  things that are getting easier are important, and I think as a

11  trial judge you have to follow what they say and use your own

12  judgment about how much those factors have been diluted, and

13  let's take an example.  I think it is fair to say that

14  documents are easier to produce than they have ever been, but

15  documents aren't the only issue.  I mean, in a case like this,

16  source code is going to be really important, and that's an

17  access to a piece of proof, and both sides in this case are

18  going to produce source code in the typical secure environment,

19  no internet, no devices, locked room supervised where?  In the

20  Northern District of California.  So it's --

21      THE COURT:  But that could be done just as easily in a

22  locked room in your office in Austin.

23      MR. RAVEL:  You know, I don't know that that's exactly

24  true because I don't think it's -- it's probably not worth

25  arguing about, but how would it get here?  I think I'm going to

1  concede the point that it doesn't have to be done there, but

2  the parties have decided that the most convenient way for each

3  side to look at each other's source code is to do it in the

4  Valley.

5      THE COURT:  Okay.

6      MR. RAVEL:  So I don't really want to get into a technical

7  argument, you and me, about technology.  I don't think that

8  goes anywhere.

9      THE COURT:  I just remember we used to -- our firm

10  certainly was able to provide -- you know, I remember we did

11  that in Austin.  And so...

12      MR. RAVEL:  It can certainly be done.

13      So Factor 3.  Willing witnesses continue under the cases

14  to be important, and I think that's what you get paid to do is

15  to look at the rules that the higher courts have made, not

16  change them but be fully aware of the changes in travel ease

17  and technology that bear on how they're applied, but I guess

18  the point I want to make here, as I think all of us in this

19  business might have gone too far in how much easier it is to

20  produce documents, how much easier it is to get places, and I

21  just don't think it's fair to a movant like Apple here to go

22  too far on those technological changes.

23      THE COURT:  And your point here would be all of the Apple

24  people and all of the NXP people would have to be traveling

25  here.  They'd all have to --

1      MR. RAVEL:  Coupled with that all of the NXP people

2  couldn't be subpoenaed here, but yes.  My point is that there's

3  not a single witness who's going to sleep in their own bed in a

4  trial in the Western District of Texas.

5      THE COURT:  And -- but as of -- as important, you're -- if

6  you were in Northern California, you would be able to require

7  the NXP people to attend the trial?

8      MR. RAVEL:  If I touch your heart on no other point in

9  this argument, that's the one I want you to walk away with.  As

10  I -- as we've all read these cases for 20, 30, 40 years, and

11  the one thing that's consistent is the gold standard of if

12  there's a showing that important witnesses are beyond the

13  subpoena power of the transferor court, you should transfer it.

14  Did I mention, Judge, Apple would like to transfer this case to

15  the Northern District of California?

16      THE COURT:  Does the fact that -- this just occurred to

17  me.  Does the fact that NXP has offices in Austin I guess --

18  again I'm assuming they've taken over Freescale and what was

19  Freescale is now NXP, right?  Is that right?  In Austin?

20      MR. RAVEL:  Right.

21      THE COURT:  Does the fact that NXP has offices in Austin

22  impact -- have no impact on your ability to subpoena NXP

23  employees who reside in another state?

24      MR. RAVEL:  No.  I don't think it does.

25      THE COURT:  Okay.

1    MR. RAVEL:  I don't think it does.  And I think the Court

2  has snapped to the point that the Freescale portion of NXP is

3  still doing what Freescale did which isn't this.  So there's

4  certainly not going to be any Freescale witnesses testifying at

5  the trial in this case.

6    THE COURT:  Right.

7    MR. RAVEL:  Judge, what I'm about to do is a little bit

8  hard.  I didn't think I would ever get old enough to quibble

9  even with a couple of words in the jurisprudence of Andrew W.

10  Austin, United States magistrate judge, and I do that with some

11  trepidation.  Unfortunately from Judge Austin who's, as you

12  know, as scholarly a person as there is in the world.  He's the

13  one who kind of got this little weight wording into things.  He

14  was citing a case that said less weight and he came up with

15  this little weight which other judges have glommed onto, and I

16  don't want to make a big deal out of it, but what we think the

17  law is is third party witnesses' location, great weight, party

18  witnesses, less.  This little weight thing I think we're trying

19  to distinguish away here.  Not that it matters all that much.

20    You know if I'm coming to this case, Judge, I'm pretty

21  close to sitting down.

22    THE COURT:  You know, Judge Austin may be so embarrassed

23  by that change he's -- he may just quit the bench.

24    MR. RAVEL:  Oh, I hope not.

25    (Laughter.)

1    MR. RAVEL:  That would be an unintended consequence of

2    this argument, Judge.

3    THE COURT:  Well, he's told me he's planning to quit the

4    bench and I think I finally figured out the reason why.  He

5    can't handle the shame of having changed the word "less" to

6    "little."

7    MR. RAVEL:  Well, I told you it wasn't a big deal, Judge.

8    Uniloc vs. Apple less than six months ago.  What did Judge

9    Yeakel think was important to put in his conclusion?  That the

10   Apple witnesses and third party witnesses are in the Northern

11   District of California, and he used those magic words that I've

12   repeated altogether too much, and beyond the subpoena range of

13   the Western District of Texas.  Judge, it's right on point.  I

14   think it's indistinguishable and it's brand new.

15   I'm going to breeze through Dataquill because I've used

16   that egg and yoke thing about as much as anybody can stand,

17   but --

18   THE COURT:  I'm only disappointed.  I would have thought

19   you would have made Dataquill the very first slide that you

20   had.

21   MR. RAVEL:  Well, but I did the sucking up way before I

22   even got to it if you've noticed.  You know, the half as good

23   as the guy they used before.  So I think I get points for that.

24   See, the reason that's important is because what you got

25   Judge Sparks to do is exactly what I'm asking you to do here.

1    THE COURT:  That's not lost on me.

2    (Laughter.)

3    MR. RAVEL:  It's -- you can have a big presence here if

4    it's unrelated, yoke and egg.  I'm never going to understand

5    that.  And you look to where the witnesses, local company and

6    third party, are and he did a real nice job that day.

7    I'm not going to spend as -- probably as much time as I

8    should distinguishing the Roku case.  I just would like to rise

9    and fall under the argument that they were awful generic about

10   just convenience.  They didn't give you names.  They didn't

11   give you subject matters, and I'm not being critical.  I just

12   think this is a different case, Judge, and, you know, it's one

13   you wrote.  So I'm just going to -- I'm going to count on you

14   and the staff to see the differences, but it's -- on every

15   factor the proof is just really different here.

16   Apropos to your question, Judge, is Slide 24.  Fifth

17   Circuit still thinks that that old school stuff is important.

18   That just fires my argument that you've got to lay progress

19   over the authorities and come up with the right answer.

20   Your Honor, at this point, you know, sometimes at this

21   level in this sort of litigation people think it's persuasive

22   to make ad hominem attacks on the other side and their morals

23   and their evidence and everything they say.  And as I respond

24   to Fintiv's evidence, I'm not being critical.  I think they

25   dealt with what they had in an honorable and professional way,

1  but what I'm trying to iterate or trying to communicate to you

2  here is the facts they had to work with were such that you

3  couldn't even make up persuasive evidence to move the needle on

4  the strength of Apple's evidence.  So I'm going to discuss it

5  very, very briefly.

6       THE COURT:  I think I get the point.

7       MR. RAVEL:  Okay.

8       THE COURT:  And I'm pretty familiar with -- unless it's

9  changed dramatically in a couple years, I'm pretty familiar

10 with the Apple distribution in Austin.

11      MR. RAVEL:  Well, I wanted to try to debunk their evidence

12 about it, but I'll just save that for rebuttal if necessary,

13 Judge.  I'll take my cue from you.

14      Let's go to Slide 29, and you know when you start talking

15 about the factors, you're really close to the end.

16      THE COURT:  Not close enough but close.

17      MR. RAVEL:  I'll accept that.

18      (Laughter.)

19      MR. RAVEL:  Judge, we have not done the private factors in

20 order.  We have taken a chance and we have tried to order them

21 in the order that they should be ordered in terms of

22 significance rather than what the courts decided to do.  In

23 Private Factor 2, NXP with witnesses from San Jose makes the

24 secure element, and the secure element contains I don't want to

25 say all, I don't want to say mostly.  I'll say mostly all of

1   the structures that I showed you in Independent Claim 23.  So

2   that NXP makes the secure element is translated to their San

3   Jose engineers.  Whatever particular engineers get designated

4   probably by them in the 30(b)(6) context next February or

5   March.  We know that NXP engineers are important and maybe NXP

6   is going to decide which ones are important, but they're going

7   to be at San Jose.

8       THE COURT:  Is -- and I'm foreshadowing what I want to

9   hear from Fintiv on this, but could NXP have been brought as a

10  defendant in the case because of what they do?

11      MR. RAVEL:  That's not a decision that I'm competent to

12  make on their behalf.

13      THE COURT:  Well, here's -- I guess I just find it curious

14  and I want to hear from the plaintiff as well.  I mean, if NXP

15  is as critical and necessary as you say they are, I mean,

16  because your argument kind of rises and falls on NXP is

17  critical.  You're going to need them to have witnesses at

18  trial.

19      MR. RAVEL:  I would prefer to say that's an important part

20  rather than rises and falls, Judge.

21      THE COURT:  Well, let's say it's one of the more important

22  factors.

23      MR. RAVEL:  Stipulated.

24      THE COURT:  Okay.  I guess I'm curious if they -- if it's

25  mandatory for NXP to be here, I'm curious why that is unless

1  they infringe as well.

2      MR. RAVEL:  Judge, I think I'm going to keep my answer.  I

3  think that question is more over my shoulder to Fintiv.

4      THE COURT:  Okay.

5      MR. RAVEL:  But my answer to the question is we're on the

6  way to Markman without them and that is a decision that was

7  made by Fintiv many months ago and this case has a momentum

8  without NXP.

9      THE COURT:  And I'm not inviting them to sue as much as

10  I'm -- it seems to me that if NXP were -- if NXP is -- you're

11  making it sound almost to me like NXP is a necessary party in

12  terms of witnesses.

13      MR. RAVEL:  Just in terms of witnesses, Judge.

14      THE COURT:  In terms of witnesses.

15      MR. RAVEL:  Not a necessary party.  Their employees are

16  necessary witnesses.  I'm not going to walk over to that

17  necessary party line with you, Judge.

18      THE COURT:  Okay.  And what makes their witnesses

19  necessary?

20      MR. RAVEL:  They design the secure element which is

21  substantially every structure that is in their -- in their

22  infringement contentions.  All the software ideas, modules, the

23  whole progression, all of the structure that makes the

24  recording of the credit card possible is within that NFC

25  component that they make.  And in one of the declarations, and

1    I'm not going to take the time to find it now.  It's the one

2    where I described it as cradle to grave.  They design it and

3    they collaborate with Apple on the administration of it, and I

4    think that's undisputed.

5         Sven, could we please go to --

6         THE COURT:  And you're not going to answer this, but I'm

7    going to ask it.  And I'm not even sure it's an appropriate

8    question which means if you don't answer it, it's probably

9    okay.  Putting on the real world hat, if NXP is as inextricably

10   intertwined with this product as you indicate they are --

11        MR. RAVEL:  I'd like to go with very important witnesses,

12   Judge.

13        THE COURT:  If their witnesses are -- if their witnesses

14   are that important because of their involvement with these

15   products, what is the likelihood that if Apple asked an NXP

16   witness to be wherever they wanted them to be in the real world

17   that an NXP witness would not attend?

18        MR. RAVEL:  I could certainly conceive of a situation

19   where the relationship could get very contentious, Judge.  I

20   think it's a toss up.  I could -- I could see NXP and Apple

21   being very adverse to -- my common sense says being very

22   adverse to each other on this situation maybe in another

23   context.  I answered it, just not very well.

24        THE COURT:  No.  No.  No.  You answered it -- there's not

25   a well or not well.  I really am trying to figure out because

1  my spidey sense would be that given the relationship you are

2  stating they have, the necessity of the witnesses -- the NXP

3  witnesses comes from their integration into the products that

4  Apple is selling, and I'm just trying to figure out.  I have a

5  hard time imagining them not doing what Apple would want them

6  to do, but I'm not sure that that's -- that's -- I'm not sure

7  that's a fair -- it's not a fair question.  I stipulated to

8  that and I'm not sure it's an element that should go in my

9  analysis.

10      MR. RAVEL:  Well, I'll argue that it's not, but I'll put

11 out this tantalizer when it's -- between now and the next -- my

12 next time it's my turn to talk, I will have a brief

13 consultation with my client and see if the thing that's in my

14 head is accurate, and if it is, I'll share it with you then

15 because I said I could conceive.  I don't really want to talk

16 about something that the only source of right now is me.

17      Could we go to 29, please, Sven?

18      Okay.  Closing argument is supposed to match up with

19 opening statement, Judge, and this was a little bit trial like.

20 I told you I was going to tell you.  I showed you my proof and

21 now I'm going to make a really short argument.  NXP makes the

22 guts, makes the guts of the process by which Rachel can add

23 Suzanne's AMX to her iPhone and keep using it and those

24 witnesses are in San Jose.

25      THE COURT:  And if Rachel were able to show me how to do

1 that with my iPhone and my watch and also how to turn the

2 ringer off of my watch, I would probably appreciate it.

3     MR. RAVEL:  We'll set it up.

4     Further, the Court's Freescale question, those witnesses

5 don't make a difference.  The bank liaisons are out there.

6 Something of a collateral point.  Still matters.  The Apple

7 witnesses are in the Northern District of California and Fintiv

8 has a couple of officers here who are not steeped in the

9 technology.  Just playing into the Court saying why is it

10 important anymore, the cases say so.  That's the best I can do.

11 And I didn't mean to be glib there.

12     THE COURT:  No.  I think that's right and it is a big

13 question for me to -- and I'll -- not me qua me, the district

14 judges who are trying to deal with the evolution of what's fair

15 in this day and age in terms of that particular public factor.

16 Public Factor 2.  I think that's -- I think we're struggling

17 with that.

18     MR. RAVEL:  Well, I think I'm about to make an argument

19 that may kick as good as it shoots, but those of us who deal

20 with technology all the time might be out ahead on dissing the

21 former rules, and so I can say that was bad and I am saying

22 that's bad, but I guess the counter argument would be if we're

23 the ones who are up to the minute on technology, you know, it's

24 bad, Judge.  It's bad to get ahead of the authorities.

25     Two more slides, Judge.  And I think these words are

1  really important and they come right out of the proof.

2  Research, design, development, testing and administration.  The

3  life of an accused structure.  Device side, service side, phone

4  side, wallet side are done by Apple in San Jose.

5       The same cradle to grave -- at least design, development,

6  administration is done maybe on the phone, maybe in person,

7  maybe by video chat with NXP people are in San Jose.  Maybe

8  they get together.  I don't know.

9       And I think the big distinction from Roku is we've given

10  you names and subject matters.

11       THE COURT:  No.  Yeah.  I don't think there's any doubt

12  this is a more robust challenge for sure.  I mean, there were

13  some other differences as well, but for -- you know, I'm --

14  when I say I'm familiar with Roku, I'm not again being glib.  I

15  mean, for better or worse until I had the good fortune of

16  getting Dr. Yi to join me as a law clerk, everything that came

17  out of this Court I actually had to do myself.  And so I am --

18  I was very familiar with Roku and I've actually read everything

19  here and am familiar with all this as well.

20       MR. RAVEL:  NXP which bought Freescale swore that there's

21  not going to be any Austin trial witnesses from them, and I

22  don't think Fintiv has been able to challenge effectively the

23  evidence that we've put on that how the under-the-hood

24  structures that are accused here that provide the function of

25  putting a credit card number on a phone or a watch safely is

1  done here in Austin.  I think they'd put the best face on if

2  they could, but I just don't think you can -- you can't square

3  a circle like that.  It isn't true so you can't prove that it's

4  true.  So --

5      THE COURT:  If the plaintiff had included NXP as a party

6  which makes it easier for one to require witnesses to show in

7  the same case, but everything else were the same, all the NXP

8  employees who would be involved are in California, then your

9  argument under Public Factor 2 would still be as strong though,

10 right?  I mean, your argument would still be, okay.  NXP is

11 also a party.  That doesn't change the fact on Slide 32 that

12 everything's done in California.

13     MR. RAVEL:  Right.  And I don't -- and I -- exactly right,

14 Judge.  I don't think NXP as a party would change the argument

15 or dilute it in any way.

16     THE COURT:  Let me ask you this:  You know, let's go to

17 where -- you had a slide, didn't you, where you were discussing

18 the security feature.

19     MR. RAVEL:  The secure element?

20     THE COURT:  Yeah.

21     MR. RAVEL:  There were several.

22     Let's go back to the beginning of the claim in the Claim

23 23 and we'll find it for the Judge.

24     I can -- if you can tell me a little more about it, I can

25 show you which one.

1       THE COURT:  Well, what I want to go into is I'd like for

2   you to put on the record -- oh, here it is on Slide 6 under

3   Mr. Dachs.

4       MR. RAVEL:  Yes, sir.

5       THE COURT:  The fact that he is in charge of the secure

6   element or the NFC component, what -- how does that feature

7   relate to the patents that are involved in the case?

8       MR. RAVEL:  I can demonstrate that, Judge, with the next

9   slide.

10      THE COURT:  Okay.

11      MR. RAVEL:  7.  And I'm going to walk over to it.

12      The secure element which NXP provides embodies just about

13  every accused step.  Notice the last words:  Stored in the SE.

14  NXP gives us a turn key product that has the terms that has the

15  widget, the apps, the applet in it.

16      THE COURT:  And does hardware perform any of the security?

17      MR. RAVEL:  I don't know that answer for sure.  I think --

18      THE COURT:  Does anyone at your table?

19      MR. RAVEL:  Mr. Jensen?

20      MR. JENSEN:  It's primarily the software, Your Honor.

21      THE COURT:  Primarily the software?

22      MR. JENSEN:  That's correct.

23      THE COURT:  And who is it -- who is it that does the

24  software?  Who makes the software?  Is it Apple or is it some

25  other third party?

1    MR. JENSEN:  It's primarily NXP.

2    THE COURT:  Who does the software for the security?

3    MR. JENSEN:  Who does the software for the secure element?

4    It has its own operating system that is provided by NXP.

5    THE COURT:  And the software that's done by NXP, those

6    engineers are also all in California?

7    MR. JENSEN:  Or Europe.

8    THE COURT:  Or Europe.  Okay.

9    MR. RAVEL:  Your Honor, unless you or Dr. Yi have any more

10   questions, I'm going to leave it there for now.

11   THE COURT:  Why don't you -- we'll finish with you.  I'll

12   hear from opposing counsel and then before you get back up I'll

13   take a short break and find out if there's anything I haven't

14   asked you that I should have, and when we come back out I'll

15   let -- I'll have more to ask.

16   Mr. Waldrop?

17   MR. WALDROP:  Thank you, sir.

18   THE COURT:  Thank you, Mr. Ravel.

19   MR. RAVEL:  Thank you, Judge.

20   THE COURT:  Y'all should note that Mr. Tindel's tie

21   reflects confidence.

22   (Laughter.)

23   MR. WALDROP:  Very strong, Your Honor.  It's very strong.

24   MR. TINDEL:  Are you making fun of me, Your Honor?

25   THE COURT:  No.  I'm jealous that you -- you know, I may

1  go out and buy a tie just like it.

2      MR. TINDEL:  I'm used to that from Judge Davis but not

3  you.  I may have to get used to it.

4      MR. WALDROP:  Bear with us, Your Honor.  I think we're

5  just pulling up the slides.

6      THE COURT:  Okay.

7      MR. WALDROP:  What we can do, Your Honor, is we can just

8  go ahead with the paper copies, Your Honor, if that's okay.

9      THE COURT:  I'm good.  Mr. Ravel is more of a showman and

10  he wanted the screen.  I'm pretty good if you just tell me what

11  page you're on.  I can usually follow along.

12      MR. WALDROP:  Thank you, Your Honor.

13      May it please the Court.

14      THE COURT:  Yes, sir.

15      MR. WALDROP:  My name is Jonathan Waldrop.  I'm with the

16  law firm of Kasowitz Benson Torres on behalf of the plaintiff

17  Fintiv, Inc. in this case against Apple, Your Honor.

18      THE COURT:  Yes, sir.

19      MR. WALDROP:  This is a case in which Apple has not and

20  cannot meet its heavy burden of showing that the Northern

21  District of California is clearly more convenient than the

22  Western District of Texas, and this makes sense, Your Honor, in

23  the real world today as we stand here in the Western District

24  for four important reasons that I will discuss throughout my

25  presentation.

1          First, Your Honor, the majority of the identified to this

2     date third party witnesses are located in the Western District

3     of Texas, and when I mean identified, particular names of

4     witnesses have been identified by the plaintiff.

5          Two, Your Honor, Apple's significant presence and

6     investment in the Western District of Texas along with the

7     plaintiff.

8          Three, Your Honor, Fintiv's long standing presence almost

9     over a decade in the Western District of Texas, the location of

10    its employees and the locus of facts and circumstances

11    regarding its presence in Texas are here.

12         And, finally, Your Honor, the significant local interest

13    and the resolution of this dispute.

14         The major parties all involved in this dispute have large

15    undisputed presences here which make the resolution of the case

16    in this district the most efficient and the best and reasonable

17    forum for the resolution of this case.

18         Now, as an aside, Your Honor, I've been involved in many

19    motions to transfer both on the plaintiff's side and the

20    defendant's side.  And under facts like these where both the

21    parties -- Apple has thousands of employees here, NXP, a

22    relevant third party, has thousands of employees here.  The

23    plaintiff has a long standing presence in the district.  The

24    way to defeat a motion to transfer has not been carried by

25    Apple.  The relevant things that you would focus on to me in

1  such a circumstance would be the third parties that are

2  relevant to the case and the Court's ability to have access

3  over those individuals for both parties, not just for the

4  defendant, because we get a vote here too, Your Honor, but for

5  the plaintiff.  And in that case, Your Honor, when focusing on

6  third party witnesses within the compulsory service control of

7  this Court, under the facts as they stand now, plaintiff has

8  clearly carried the day, and we'll discuss that more, having

9  identified the majority of the third party witnesses that we

10  believe have relevant information and in the case of where

11  there's a factual conflict or dispute as to what the relevance

12  of those witnesses are under this case law as we discussed

13  several months ago those factual conflicts are resolved in the

14  non movant's favor.

15       THE COURT:  Mr. Waldrop, why don't you jump to that?  I

16  heard a lot from Mr. Ravel about the third party witnesses at

17  NXP who would be unavailable.  Why don't you jump to -- because

18  I think that's what I care most about -- to your argument that

19  there are third party witnesses whose convenience mandates or

20  would lean towards the case being kept here?

21       MR. WALDROP:  Thank you, Your Honor.

22       That is the crucial factor for us, and if I could direct

23  the Court's attention to Slide 13, Your Honor.

24       THE COURT:  Okay.  Give me one second.

25       MR. WALDROP:  Let me know when you're ready.  I'm at your

1  convenience.

2      THE COURT:  I am.  Yes, sir.  Thank you.

3      MR. WALDROP:  On Slide 13, Your Honor, we have a summary

4  of the third party witnesses that have been identified by the

5  plaintiff Fintiv as having relevant information regarding the

6  case.

7      On the left side we have 15 third parties identified and

8  on the right side we have a few of Apple's third party

9  witnesses identified.  Now, this is a very important chart

10 because it summarizes the key facts, and I'll intersperse the

11 law on this Private Factor 2, but, Your Honor, we took the time

12 to identify at least four relevant NXP witnesses that are in

13 this district from our estimation and from our investigation

14 list having information relevant to NFC controllers which --

15     THE COURT:  So just to put on the record, and Mr. Ravel

16 can respond, on Slide 13 we have Mr. Huang, H-u-a-n-g,

17 Mr. Tang, Mr. Fox and Mr. Hill, all engineers -- or Mr. Fox --

18 I don't know what a director means.  At NXP maybe it's an

19 engineer.  Maybe it's not.  But you have those four.  And then

20 you have Mr. Jose Correa who is the strategic partnership of

21 banking American at NXP.  So your contention is all those folks

22 are here?

23     MR. WALDROP:  They are here, Your Honor, and from our

24 diligence and investigation appear to be relevant to the facts

25 in this case.

1          Now, I understand that they have submitted a declaration

2     from NXP saying that these people are not relevant.  That's a

3     factual dispute, Your Honor, which we think goes in our favor,

4     and also they say that NXP does not plan to call them as

5     witnesses, but we get a vote as well, Your Honor.  We get a

6     vote as well.  It is our burden to prove this case, and having

7     compulsory control over these individuals would be important.

8     And then, Your Honor, one thing that was not listed or

9     mentioned in Mr. Ravel's presentation which -- but is

10    overarching and looming is that NXP's U.S. headquarters are

11    here in the Western District of Texas.  I'll repeat that.

12    NXP's U.S. corporate headquarters are here.  So we are in the

13    place where the vast locus gravity, center of gravity of NXP's

14    U.S. activities is in the Western District of Texas.  I think

15    that's a great place to be for purposes of exploring NXP's

16    involvement in this case.

17         THE COURT:  And let me ask you this if you know, and if

18    not, Mr. -- again Mr. Ravel can address this.  The fact that

19    NXP is here or has at least engineers here vis-a-vis their

20    acquisition of Freescale, does that make a difference with

21    respect not to -- the ability to require witnesses to attend or

22    not attend?  That's a separate issue.  But does the fact -- let

23    me -- in fact, let me expand it and I'll have Mr. Ravel address

24    it when he gets back up as well.  It seems to me, but as we all

25    know, I'm not a technical person, but it seems to me that if

1   Apple and NXP both have major facilities here, and I think

2   that's a fair -- I don't think there's any debate over that.  I

3   get -- for example, Mr. Ravel would say, well, the folks that

4   are here aren't -- for Apple aren't involved.  I get that.  But

5   for purposes of my question, it seems to me that the fact that

6   Apple and NXP both have major facilities in the Western

7   District means that the ability to produce documents, software,

8   anything non personnel would be almost of no moment.  I mean,

9   it seems to me that an NXP or an Apple engineer in -- it being

10  Apple, the greatest company in the world, they make my watch,

11  and NXP being -- doing what they do, that they have to be set

12  up to where anything they need in terms of source code,

13  software, documents, whatever it is, is virtually

14  instantaneous, it can be obtained in this district given the

15  size of the facilities here.  Do you have any reason not to

16  agree with that?

17      MR. WALDROP:  I completely agree, Your Honor.  You're

18  correct.

19      THE COURT:  And I'll hear from Mr. Ravel if for some

20  reason I'm overestimating their technical ability to make that

21  kind of stuff available.  So if you would continue with respect

22  to I'm -- I am very interested in your record with respect to

23  who -- what other third party witnesses there might be in this

24  district.

25      MR. WALDROP:  Yes, Your Honor.  I will continue.

1      So we've identified from our investigation as best we

2  could without the benefit of discovery but based on the

3  information available to us publicly, and it's not disputed

4  that there are at least five individuals at NXP who have what

5  we believe to be relevant testimony and information that are in

6  the district.

7      THE COURT:  And again I've faced this issue several times

8  now.  It is your representation as an officer of the Court -- I

9  mean, I get that the defendants may stand up and say, oh,

10  they're not really important.  And I'm sure they would be doing

11  that in good faith.  I know Mr. Ravel very well and I know the

12  others less well, but I have no reason to think they wouldn't

13  have equal standing in terms of good faith, but you are

14  representing to the Court as an officer of the Court as the

15  plaintiff in this case that you believe that the NXP folks that

16  you've identified on Page 13 either are or could be relevant

17  witnesses in the prosecution of this litigation by Fintiv?

18      MR. WALDROP:  Yes, Your Honor.  Absolutely.  At least

19  these and probably more.

20      THE COURT:  Okay.

21      MR. WALDROP:  So we have identified these five NXP

22  individuals, Your Honor, and Mr. Ravel said something that I

23  thought was very telling and I agree with in this sense

24  regarding trial.  If I'm at trial, I want to have access to

25  these people, not to the people that NXP is willing necessarily

1  to make available but the people that I've talked to would and

2  have relevant facts for my case, not necessarily Apple's case.

3      Moreover, Your Honor, there's another wrinkle, and this is

4  consistent with the greatness of Apple, Your Honor. Its

5  ability to create tremendous eco systems, partnerships wherever

6  it goes. As you know, the Austin facility here is the second

7  largest campus in the world. It is going to get bigger. It is

8  going to evolve. Apple is the best at that. Some may

9  disagree, a few of my other clients may disagree, but they have

10  created a tremendous eco system, and in creating that eco

11  system, Your Honor, in our diligence we identified yet another

12  third party called STMicro which we believe from our diligence

13  may also be involved in supplying chips that may be used in

14  Apple's products.

15      You'll see, Your Honor, in Exhibit S we have an article

16  which discusses that STMicro supplies chips used in the Apple

17  iPhone related to Apple Wallet. Now, Apple disputes that.

18  That's a factual dispute, but we've identified information that

19  indicates that STMicro may also be involved in infringing

20  activity. Lo and behold, Your Honor, not surprising because of

21  Apple's development as eco, STMicro has additional engineers in

22  Austin. STMicro is also headquartered in Coppell, Texas, not

23  far from here. We believe these individuals need to be

24  explored in -- and if it is cooperative, which we believe it

25  may be, those individuals are within the absolute subpoena

1  power of this Court.  They're in Austin.  These individuals are

2  listed on the left side of Slide 13.  They include Sean Newton,

3  Jeff Blauser, Luca Spelgatti, Joe Tijerina and Steve Miller.

4       There has been no discussion by Apple of that other than

5  to say that STMicro is not involved in the provision of NFC

6  technology.  We have facts to indicate that that may be not

7  necessarily inaccurate but in conflict with things that we want

8  to know.  We would love to be able to have the subpoena power

9  of those individuals they haven't identified specifically, and

10 we've researched that.  There's been no rebuttal factually to

11 that, Your Honor, other than Apple's bald statement.

12      THE COURT:  Are the -- whoever these are, are the folks at

13 STMicro within the subpoena power of this Court?

14      MR. WALDROP:  Absolutely, Your Honor.  They're in Austin.

15      THE COURT:  Okay.

16      MR. WALDROP:  Going further, Your Honor, we also identify

17 an additional five banks which from our due diligence show that

18 they work in concert with Apple for the provisioning of the

19 Apple Wallet, Apple Pay functionality.  Those banks include

20 Frost Bank, USAA, Comerica Bank, PlainsCapital Bank, Texas

21 Capital Bank.  These -- all five of these banks have

22 individuals who work with Apple to deliver the functionality to

23 users.  This is important, Your Honor, because we also have an

24 inducement claim.  We have indirect infringement claims, and

25 Apple's activities relating to third parties to provide its

1   services are extremely important in this case and we think

2   there will be relevant information and testimony elicited from

3   these banks that are helpful to our case in proving our case.

4   So when you look at the evidence on the left side, Your

5   Honor, we have identified particular witnesses with names and

6   what we believe to be the information that they have based on

7   our diligence. We provided that to the Court in a good faith

8   basis as to them having relevant information.

9   And on the other side what has Apple done? Apple has not

10  identified third party witnesses sufficient detail to overcome

11  the majority of the witnesses that we have identified. They

12  referenced eight inventors, three prior artists which, as you

13  know, Your Honor, under the case law given very little weight.

14  They talked about the original assignee of the prior art

15  references of Vivotech, Incorporated without identification of

16  any witnesses. And they made mention the fact that Visa is one

17  of the third party providers along with American Express,

18  Discover and the like. I actually think that the

19  identification of Visa actually undercuts their arguments

20  because the other providers are closer to Texas than they are

21  to California, including American Express and Discover.

22  So if you look at the third party witness factor, which we

23  believe is the most important factor in a case postured like

24  this, the overwhelming identification of witnesses at this

25  point in the case favor Fintiv and not Apple.

1    Another interesting point, Your Honor, given Mr. Ravel's

2  presentation, which was very good, but the one thing that I was

3  waiting for and I didn't hear was the identification of the

4  witnesses in the Northern District of California who work with

5  NXP.  There was one declarant which he discussed Mr. Dachs, but

6  he did not identify any of the other individuals in the

7  Northern District of California who work for NXP who are part

8  of this Apple team.

9    Now, Your Honor, you -- as you know the law in this case

10  in this district is that general allegations that key witnesses

11  are unavailable or inconveniently located are insufficient and

12  you need to identify specific witnesses.  I think Apple was

13  very careful in their declaration.  They did not list these NXP

14  witnesses who are on the Apple team.  They supplied

15  declarations but they did not list those individuals.  They

16  said that the people in Texas would not be presented as

17  witnesses, but they don't identify who exactly they would call.

18  And, Your Honor, we think it would be extremely unfair to be

19  limited to the 30(b)(6) designee of NXP in proving our case.

20    Going further, Your Honor, on Slide 14, we summarize it

21  further for the Court's convenience regarding this third party

22  issue.  Apple admits that NXP supplies the NFC controllers

23  using Apple iPhones and watches.  We also think STMicro is

24  involved as well.  It's undisputed that NXP's U.S. corporate

25  headquarters are in this district.  It's undisputed that NXP

1   has at least 3,000, I think as many as 5,000 employees in this

2   district.  And it's undisputed, Your Honor, that NXP employs

3   five individuals with knowledge concerning NFC technology which

4   Mr. Ravel and I agree will be an important factor in this case

5   or in this district, and they're specifically identified.

6   Regardless of whether or not NXP is going to call them or use

7   them, that's fine, but we get a vote as well, Your Honor, and

8   we're the plaintiff and we would definitely want to talk to

9   these individuals and they're listed there on Slide 14.

10      On Slides 15 and 16, Your Honor, we just give the Court in

11  summary fashion more information that was supplied in the

12  record but for purposes of my presentation are helpful for the

13  basis for our belief that they have the NFC experience that

14  would be relevant to this case.  So we have printouts from

15  NXP's web site and from LinkedIn profiles regarding the

16  identification of their NFC knowledge which is listed in

17  Exhibits S and T, Your Honor.  That's on Slide 15.  And this is

18  Mr. Kenny Huang and Ran Tang, Your Honor.  So it's undisputed

19  that they have this NFC knowledge.

20      On Slide 16, Your Honor, we address specifically that

21  Apple does not name a single NXP witness located in N.D. Cal.

22  but they reference a team.  The declaration of Mr. Dachs says

23  they will not offer these witnesses, but, Your Honor, that is

24  of no moment for purposes of our position on the motion to

25  transfer that it should be denied.

1    And, finally, Your Honor, Mr. Dachs doesn't dispute that

2    Messrs. Huang, Tang, Fox, Hill and Correa have knowledge about

3    NFC components, only that NXP will not offer them as a witness,

4    further proving our point about the importance -- potential

5    importance of them to this case.

6    And then in Slides 17 and 18, Your Honor, we provide just

7    the narrative that is the backing of Slide 13 in summary

8    fashion of how these witnesses fit in and why it is our belief

9    that there are numerous third party witnesses in this district

10   who would be relevant to the plaintiff.  The plaintiff chose

11   this jurisdiction to bring this lawsuit.  The plaintiff is

12   located here.  And on Slide 17 we identify the basis for why we

13   think STMicro may supply Apple with a serial access

14   microcontroller used in the secure element functionality.  We

15   provide a printout of that basis of that information.  Again we

16   list the five individuals in Austin who are engineers for

17   STMicro who appear to work on the secure element functionality,

18   all within the absolute subpoena power of the Court.

19   In fairness, Your Honor, and on Slide 18 we discuss

20   because we want to make sure the Court has the benefit of all

21   information that Mr. Jaynes at Apple says that STMicro does not

22   supply any NFC secure element chip or controller used by Apple

23   Pay or Apple Wallet.  That is in direct contravention of

24   information that we supplied the Court regarding the NFC

25   technology world.  And then we list for the Court's

1  convenience, which the Court is aware of that when deciding a

2  1404 transfer motion the Court can consider declarations, but

3  it must draw all reasonable inferences and resolve factual

4  conflicts in favor of the non moving party.  So it is not

5  enough for Mr. Ravel or Mr. Jaynes to say, you're wrong.

6  You're wrong.  That's a factual dispute that's resolved in our

7  favor.  The real issue which all of this hinges on is to -- for

8  Apple to identify to me the third party witnesses that are

9  negatively impacted, and on that basis, Your Honor, they have

10  failed.  I've been in a similar situation in other

11  jurisdictions and come down to this issue.  It is the third

12  party witnesses, their presence, their identification and the

13  convenience in this district being the most relevant factor,

14  Your Honor.

15      I'd like to stop to see if the Court has any questions.

16  Otherwise I'll continue with my presentation, Your Honor.

17      THE COURT:  You can continue, but you've hit the points I

18  cared most about.

19      MR. WALDROP:  Okay, Your Honor.

20      And in summary Slide 19 gives more backup regarding the

21  banks that is undisputed that have worked with Apple to promote

22  and demonstrate the Apple Pay functionality that are all in the

23  Western District of Texas and within the absolute subpoena

24  power of this Court.

25      One final point, Your Honor -- no.  I guess it won't be

1  final, but relating to the Apple witnesses, on Slide 22, Your

2  Honor, we identify what we believe is here relevant to Apple,

3  Your Honor.  There are a number of job postings for Apple Pay

4  and Apple Wallet related positions.  I understand that the

5  plaintiff -- that Apple says that these people are prospective,

6  but I think it's indicative of the importance of the Austin

7  facility and its ubiquity and its integration into the eco

8  system that Apple's created.

9       Also, Your Honor, there is an individual Ruotao Wang who

10 is a design verification engineer at Apple that has NFC

11 experience and knowledge, Your Honor, that's also at Apple in

12 the Austin office that's undisputed.

13      It's undisputed, Your Honor, also that there are at least

14 29 AppleCare employees with knowledge of Apple Pay and Apple

15 Wallet.  This goes to our indirect infringement claims, Your

16 Honor.  They're all in Austin.  It's undisputed that they're

17 all in Austin.

18      And then there's another 11 non AppleCare paid employees

19 that have knowledge of Apple Pay and Apple Wallet that are here

20 as well and go directly to our indirect infringement claims.

21 We would like to have access to those individuals.

22      And so -- and this all makes sense, Your Honor.  They have

23 over 6,000 employees here, you know, Your Honor, and they plan

24 to get to 15,000 in the next several years.

25      And if I could direct the Court's attention to Slide 26,

1  which I'm sure the Court is aware of, but I cite to it to

2  buttress the fact that, you know, Fintiv picked the Western

3  District of Texas and Apple picked the Western District of

4  Texas, rightfully so, and we think in good judgment we're here

5  because the parties all picked this place and they're investing

6  heavily in here and we just have a listing of facts that

7  further buttress the significant localized interest in this

8  dispute.  You know, Apple has 1.1 million square foot of a

9  campus here in the district.  It's the largest population of

10  Apple employees outside of Cupertino.  They've gotten over $21

11  million in incentives for development of the Austin campus, and

12  this is not to -- this is not to derive them and say it's

13  corporate welfare.  It's just to say, Your Honor, they're

14  heavily invested here.  And we agree as Fintiv we've been here

15  longer and we think it's a great place to come and they should

16  bring more people here to the Western District.  And they

17  expect to receive another $33 million from taxpayers in

18  development of an even larger facility.  133 acres, Your Honor.

19  So this is a locus of activity for the plaintiff and for the

20  defendant.  It is the right place.  We're in front of the right

21  judge, in front of the right --

22      THE COURT:  See, Mr. Ravel.  That's the way you wind up.

23      (Laughter.)

24      THE COURT:  You didn't once say anything good about me.

25  You know, you had your chances.

1      (Laughter.)

2      MR. RAVEL:  I was going to end strong with that in

3   rebuttal where he couldn't me too it.

4      THE COURT:  Okay.

5      MR. WALDROP:  For the just, speedy and correct resolution

6   of this case.  And with that, Your Honor, I will -- if I get

7   another opportunity to rebut, I would love to, Your Honor, just

8   on a few things.

9      THE COURT:  You will.  No.  You definitely will.  Let me

10  take a quick break and chat with my clerks about what we think

11  is interesting.  We've got plenty of time.  Y'all will have as

12  much time as you need for rebuttal, but let me go get myself a

13  little bit organized.

14      I will -- Mr. Ravel, obviously -- and so far he's

15  pronounced your name four different ways.  I liked "Ravel" the

16  best, and I think you might think about going with that in the

17  future.

18      MR. RAVEL:  As you know, my kids say that already.

19      THE COURT:  I'm trying to figure out how my court reporter

20  puts down the inflection in my voice when I say "Ravel."  I'm

21  not sure how she does that.  I'm looking forward to reading the

22  transcript and seeing if she can actually capture what it is

23  that I'm saying.

24      MR. RAVEL:  You asked for it, Judge.

25      THE COURT:  I did.

1    MR. RAVEL:  That outfit out in Northern California, Ravel,

2    Ravel, Unravel, the analytics people, when they e-mailed me,

3    they say are you a travel or a gazelle.  So it's travel or

4    gazelle.  That's the way you do that.

5    THE COURT:  Okay.  I'll be back out.  Let's resume at

6    10:30.

7    THE BAILIFF:  All rise.

8    (A break was taken from 10:22 to 10:33.)

9    THE BAILIFF:  All rise.

10   THE COURT:  Thank you.  You may be seated.

11   Mr. Ravel?

12   MR. RAVEL:  Your Honor, I'm going to be very specific in

13   rebutting the alleged proof that Fintiv put on.

14   THE COURT:  Okay.

15   MR. RAVEL:  Let me begin by taking on the standard that no

16   matter how weak their evidence is or that they can make a

17   representation of counsel, that's not what we're doing here,

18   Judge.  We're having an evidentiary hearing as if -- I think

19   the best analogy I've come up with is if we decided to try a

20   preliminary injunction case on Rule 43(h) declarations,

21   evidence is still required.  You can't -- there's no authority

22   for the proposition that things they say in pleadings need to

23   be taken as true, and so I think we are having a more

24   traditional balance of the evidence, and that's what I want to

25   take on here.

1    As an initial proposition, everything they stated to you

2 as a fact was not sworn to by anybody.  It was suggested by a

3 LinkedIn profile, which is hearsay, and newspaper, which is

4 hearsay, and Mr. Waldrop was really very careful.  He said

5 might a lot of times.  These people might.  Well, I'm about to

6 prove to you in sworn testimony that they're not.

7    I don't have a record cite for you, Judge, because

8 everything I'm going to read from here was filed under seal.

9 So I don't have a docket number or page, but I can steer you to

10 it as best I can.  There is a declaration from Mr. Dachs of NXP

11 that is Exhibit A to our reply.  Well, that's at least one San

12 Jose witness who's identified by name.

13    And I think on Page -- on Slide 17 of ours --

14    And you don't need to do it up there.

15    I think that Mr. Waldrop sort of understated some of the

16 proof from Mr. Dachs.  So let's go to Slide 17 where he

17 proves -- the highlight:  NXP would not offer anyone in Austin

18 as a witness on the functionality or technical aspects of the

19 NFC components used in the Apple products in this case, but

20 look at the line above that.  No one in Austin is or was

21 involved in the design and development of the NFC technology in

22 the NFC component.

23    What he's saying there is there are no witnesses with

24 knowledge of relevant facts.  Not just we're not going to offer

25 some supportive witness to Apple.  He is negating, and it's a

1  little hard to prove a negative, but he comes pretty close

2  here.  He is negating in a sworn declaration from NXP.  He is

3  negating this -- all this might stuff, and that's not where it

4  stops.  I mean, to me Paragraph 10 says there's nobody even

5  whose deposition should be taken here.  But we can be a lot

6  more specific than that.

7       Turning to the Dachs declaration, which is Exhibit A to

8  the reply -- I wish I could narrow it down more -- beginning at

9  Paragraph 11, and since no one has actually given this to you,

10 I'm going to have to read from it which I'm happy to do.  In

11 Paragraphs 11, 12, 13, 13, 15, 16, 17 and 18 and 19 Mr. Dachs

12 negates all these mights for NXP witnesses and I just have no

13 choice but to read it.  Fintiv asserts in its opposition that

14 Kenny Huang is a software engineer for microcontroller

15 solutions.  He programs NFC and chip readers and will

16 supposedly have knowledge about the technology accused in this

17 case and how the NFC controllers function in Apple's iPhones

18 and watches.

19      Now to the truth.  Well, the sworn testimony.  Mr. Huang

20 is a former Freescale engineer involved with legacy Freescale

21 products and microcontroller solutions, not NFC products.

22 LinkedIn versus sworn testimony.

23      Ran Tang, simplified secure deployment demo with NFC tap

24 to pair.  Former Freescale engineer involved with legacy

25 Freescale products and microcontrollers solutions, not NFC

products.

Kyle Fox.  Mr. Fox is a former Freescale product manager involved with legacy Freescale products and microcontroller solutions, not NFC products.

Robert Hill.  Technical sales engineer supposedly having knowledge relevant to the case.  Mr. Hill is a former Freescale manager involved with legacy Freescale products and microcontroller solutions, not NFC products.

Jose Correa.  Strategic partnerships banking.  Mr. Correa is a business development manager in the banking and payment network engagement case.  His work in this area does not involve Apple Pay, Apple Wallet.

So direct testimony in contradiction of inferences drawn from LinkedIn profiles and newspaper articles.  It's not even a contest, Judge.  We have proved the negative, not that we had to, but our proof, proof on third party witnesses not subject to this subpoena power overwhelms theirs with all due respect.

As to wouldn't NXP just come here, well, Judge, there is a contractual relationship between NFC and Apple, and there is always grounds, there's always ways that that can go south in a real big way, but more important than that, put yourself in NXP's shoes.  Let's say they order this transcript.  They're going to voluntarily put their people in the -- their people from San Jose because that's, you know, the only ones -- you know, they're going to voluntarily bring their people to Austin

1   to have a target painted on their back to be the next defendant

2   to be a third party that's added?  That's not a safe

3   assumption.

4        THE COURT:  Well, I would never accuse you of being

5   disingenuous.

6        MR. RAVEL:  Uh-oh.

7        THE COURT:  But we're talking about two different things.

8   All these folks are -- can be deposed, and the question here is

9   your ability, your being Apple who is the defendant, ability to

10  call them live here in Waco or in Austin or to have their --

11  because you can take their depositions too to the extent

12  they're favorable or you could use the deposition testimony

13  that has gotten during the deposition by the plaintiffs that is

14  favorable.  What I'm saying and I still believe is that if

15  Apple feels like -- and I'm going to pick on Mr. Dachs or

16  "Dachs", D-a-c-h-s.  If they believe he's a good looking young

17  man and if they believe that what he is going to say would be

18  favorable, I believe that Apple would have some influence over

19  the ability to encourage Mr. Dachs to attend, not because he

20  would -- it wouldn't -- would or wouldn't paint any additional

21  target.  The target is already there.  My guess is they can't

22  avoid a deposition.  They're going to get -- Mr. Dachs is going

23  to get to spend eight hours with these gentlemen regardless of

24  where this case is.  And so the target will already have been

25  painted or not.  So my point is just that I'm -- I will tell

1    you that -- I'll tell you what I'm really struggling with more

2    than anything is -- and I come to it having argued, as you know

3    in the -- on behalf of Apple that despite the fact that there

4    was -- is an Apple campus in Austin that the case still

5    belonged in Northern California.  What we have here are kind of

6    a unique confluence that both Apple who is the defendant and

7    NXP who is the third party of all the companies that could have

8    been the third party are in identical situations.  They both

9    have extraordinarily substantial presence in this district.

10   It's not like the NXP people who are your necessary people have

11   folks in Northern California and Nevada.  I mean, both NXP and

12   Apple are such substantial companies in this district and make

13   such benefit of this district and my guess is routinely travel

14   back and forth between this district for their companies to

15   work.  I'll just tell you I'm really struggling with why Apple

16   doesn't belong in this district.  Maybe it's Austin and not

17   Waco.  That's a slightly different argument.  And why NXP isn't

18   a third party who also -- if your best argument is that the

19   people who happen to be involved in this project are in

20   California, I get that, but NXP clearly is -- we're not talking

21   Buffalo, New York where NXP has no presence or just an Apple

22   store.  They both -- in terms of the eco system, they both are

23   very large players in this district.  And I'm struggling with

24   why they shouldn't be here because of that.

25        MR. RAVEL:  May I try to help?

1          THE COURT:  Yeah.  I mean, I've read everything you have

2     and I've made the opposite argument in fact, but I'm telling

3     you that that is what I'm most struggling with here.

4          MR. RAVEL:  Okay.  I'm going to be both formal legal and

5     real world in my answer I hope.  The legal tent that relates to

6     what the Court is talking about is the local interest.  That's

7     where it would be relevant in the analysis.  Local interest.

8     And the way I would characterize that is NXP and Apple

9     contribute mightily to Central Texas unrelated to this

10    technology.  Let's flip it.  Just on the local interest part of

11    it because what you're saying is broader than that.  You're

12    invoking the 'taint fair rule to a degree.

13         THE COURT:  A little bit, but the larger concept of venue

14    and what's fair and where the parties are and also this case

15    where you have a plaintiff that is a resident of this district.

16    And so I'm saying for example the Apple case that I had worked

17    on, that wasn't true.  The case I worked on, if I recall

18    correctly, the plaintiff may even have been a foreign

19    plaintiff.  So there was almost -- if I -- I could be wrong,

20    but my recollection was that when you're balancing it was --

21    you've got a company that is in California and Texas against a

22    company that wasn't really anywhere for purposes of where it

23    ought to be, and here we have a plaintiff that is in the

24    Western District and a defendant that is in the

25    Western District -- I get it's performing the conduct in

1   California -- and a third party that you're worried about

2   having access to who has -- who may be the -- I'm thinking

3   probably is the largest semiconductor company in this district.

4   I would guess NXP is and AMD, Motorola.  I mean, but they're

5   all --

6        MR. RAVEL:  Intel.

7        THE COURT:  Intel.

8        MR. RAVEL:  They don't make them here, but they're here.

9        THE COURT:  Right.  They're here.  But NXP is not a -- but

10  they're all up there.

11       MR. RAVEL:  Judge, let me respond to all of that as best I

12  can.  It might be a little halting.  I'm going to try to break

13  it up into pieces.  I'm going to go back to my argument that if

14  there is a legal framework for what you're talking about, it's

15  local interest.  And as an initial proposition, there's no

16  authority for the proposition that local interest can trump the

17  private factors.  I disagree with you, respectfully, that the

18  local interest even favors transfer because as to this dispute,

19  the Northern District has much more of a local interest.  Apple

20  is much bigger there.  Apple does the accused technology there

21  and NXP is there.  So just on a straight local interest

22  analysis, I respectfully disagree with your statement that --

23  and first before I get too further away, Fintiv is here in the

24  form of a we work space.  It's here, but it's not here.  It's

25  not here big.

1    THE COURT:  But I don't think we've ever -- I don't think

2    the law has ever -- I don't think we've ever, I mean,

3    distinguished in that regard.  I mean, they could be here in

4    the same space in Northern Virginia and they would get to say

5    we're in Northern Virginia.  I mean, they are here in the

6    Western District.  And I think -- I don't think we've ever --

7    in the 20 years I've been involved in patent litigation I don't

8    think we've ever really said, well, but that doesn't count for

9    Fintiv.

10   MR. RAVEL:  Judge, I'm going to -- I'm going to keep --

11   THE COURT:  But it doesn't really -- but I'm saying let's

12   not spend a lot of time on that because that's --

13   MR. RAVEL:  That's fine.

14   THE COURT:  I'm not -- that's not going to affect me.  I'm

15   just saying to distinguish between the Apple case I had, I

16   think that -- my recollection was that the plaintiffs

17   started -- I think as I recall -- and it is important in this

18   case because it certainly is similar.  I think the plaintiff

19   just presumed when they came in that it didn't matter where

20   they were from, whether it was the Western District or Mars,

21   because they were so certain that because Austin had their

22   second largest campus in -- I don't know if the second largest

23   campus is in Austin.  Who would even think to file a motion to

24   transfer because it's so obvious it belongs here that I don't

25   think they even gave -- my sense was at the hearing they didn't

1   even give any weight to the fact that they didn't have purchase

2   in the Western District on their side as well.  I get -- I get

3   that.  That's not something I care about.  My caring about is

4   much more -- the fact that Apple and NXP both are very

5   substantial corporations here and what should I do about that?

6   And I get -- and I'm even spotting that for Apple's purposes

7   everything they did is in Northern California with respect to

8   what's involved in this case.

9       MR. RAVEL:  I'm going to hang in there and disagree with

10   you that the local interest is even here as opposed to there.

11       THE COURT:  So let me just make sure.  And I'm -- I mean,

12   I really want this because I'm going to have to make -- this is

13   going to be a hard case to decide for this reason for me.  So I

14   don't want you to in any way, I can't imagine you would, to shy

15   away and say -- and just agree with me because sometimes you do

16   that with a federal judge.  But so -- just so I understand your

17   position on behalf of Apple is is that there is no -- I mean,

18   given Apple -- given Apple's presence in the Western District

19   that it -- there's no local -- that that doesn't play a factor.

20       MR. RAVEL:  Not at all, Judge.  Not at all.  And if I gave

21   you that impression, that was 180 degrees wrong.

22       THE COURT:  Okay.

23       MR. RAVEL:  It's quite a bit different than that.  And,

24   you know, you knew I was going to be hyperbolic at some point,

25   but taken to its logical extension -- well, no.  I'm not going

1   to say that.  What you've said is both NXP and Apple have

2   local -- lots of local people.  My number one response to that

3   is the actual evidence is undisputed that none of that activity

4   is related to the technology that Apple's being sued on here at

5   all.  And I think local interest first and foremost is local

6   interest in the resolution of that dispute.  And so that is

7   local interest and maybe it favors San Jose.  Even Roku won on

8   that point.  So but in the end two things are true.  That is

9   one factor and sort of a collateral factor at that and you have

10  to toggle back.  If you have 6,000 people here, do you give up

11  your discretionary rights to have the evidence on Factors 2, 3

12  and 1 considered?  And the answer to that question, Judge, is

13  just no.  Because that's a no good deed goes unpunished.  I

14  can't imagine that one has less venue rights in a -- when the

15  evidence is as strong as it is with this -- in this one on the

16  actual convenience factors.  I just don't think that Apple has

17  less rights because it contributes so much to this community.

18  I think that the most you can do with your argument of two big

19  companies in the local environment is follow the evidence that

20  their bigness does not touch this dispute and take that as one

21  of four factors and deal with that as you will, but it is in no

22  way dispositive of the others.  Maybe I should have said it

23  shorter.  No matter what the local interest is, it cannot trump

24  under the law the strong evidence on the private factors.

25        I think maybe we're -- I think it's certainly true that

1    both NXP and Apple have regular and established places of

2    business here and it would be a fool's errand to move for

3    dismissal or transfer under improper venue, but be all that as

4    it may, the factors are still the factors, and I don't think

5    they've laid a glove on our private factor evidence because

6    ours is evidence and theirs is web surfing.

7         And I want to close the loop on STMicro.  That is again

8    not a record cite because it was under seal.  But this is

9    Mr. Jaynes' declaration.  I also understand that Fintiv

10   contends that STMicroelectronics supplies the NFC secure

11   element --

12        THE COURT:  Slow down just a little bit.

13        MR. RAVEL:  Slower?

14        THE COURT:  Yeah.

15        MR. RAVEL:  I also understand that Fintiv contends that

16   STMicroelectronics supplies the NFC secure element chip and

17   controller for the iPhone XS or use in Apple Pay Wallet.

18   STMicroelectronics does not supply any NFC secure element chip

19   or controller used by Apple Pay, Apple Wallet.

20        So the NFC witnesses have been rebutted.  The STMicro idea

21   has been rebutted.  Local banks, Judge, there are 4,000 of them

22   in the United States spread equally all over the United States.

23   And again let's think about the time that Fintiv and Apple are

24   going to have for non expert witnesses in this case.  You call

25   local bankers who have no knowledge of the underlying

1    technology.  Why would you -- first of all, they're everywhere.

2    So it's not really a factor, but what is the relevant evidence

3    that comes from them that the jury would find useful in

4    deciding infringement or the existence of damages or the amount

5    of damages?  And Apple doesn't think there is one.

6        I think I have hit the points I wanted to hit.  NXP proof

7    versus NXP LinkedIn, STMicro same thing, local banks spread all

8    over the country, credit card companies all over the country.

9    I've done my best to answer your questions, Judge.  Do you have

10   any others?

11       THE COURT:  You got it.

12       MR. RAVEL:  Thank you, Judge.

13       THE COURT:  Mr. Waldrop, I apologize.  I know you've

14   got -- oh, come on up.  I know you've got things that you are

15   eager to say as quickly as possible, and when it was me, I was

16   always afraid I would forget what I wanted to say if I got

17   asked a question, but the thing I care -- one of the things I

18   care most about hearing from you and I want to make sure that

19   you address it before I forget to ask you about it is Mr. Ravel

20   touched on exactly the concern that I had which is how do I

21   balance what an affidavit from Mr. Dachs that says the NXP

22   folks you cite had nothing to do with it.  How do I balance

23   that versus you as an officer of the Court representing to me

24   that you think that they may have a role to play, and I'm

25   telling you I've struggled with it in every hearing I've had

1  that -- where I'm dealing with the legal issues in front of me

2  today and I still haven't -- I still haven't figured out what

3  the right thing to do is.  So I invite you to address

4  specifically what Mr. Ravel said in terms of that they have put

5  on evidence with respect to why those NXP folks shouldn't be

6  weighed into my consideration.

7       MR. WALDROP:  Thank you, Your Honor, for directing me.

8       Your Honor, in short, Your Honor, their rebuttal is

9  insufficient to meet their burden in showing that transfer is

10 warranted.  And I'll explain that, but I want to answer your

11 question directly.  It's insufficient.  The way for Apple for

12 me to prevail in this posture of a case was to have presented

13 more third party witnesses in the Northern District of

14 California than in the Western District of Texas with specific

15 identification.  That did not happen.  In this posture that is

16 what I would have said would have been something if you asked

17 me that's a challenge for us, but that's not where we are.  In

18 fact, we have general allegations, bald assertions,

19 disputations of fact.  And I invite the Court to turn to Slide

20 6 which is the law and --

21       THE COURT:  Of which --

22       MR. WALDROP:  Of my presentation, Your Honor, of --

23       THE COURT:  Okay.

24       MR. WALDROP:  And I'll wait for the Court to get there.

25       THE COURT:  Please.  Okay.  I'm with you.

1    MR. WALDROP:  And, Your Honor, you know, this case has

2  been cited against me on the other side.  Your Honor, I filed a

3  motion to transfer, but I think the Weatherford case and the

4  cases that are cited here on Slide 6 I think guide the Court in

5  terms of how we address this.  When deciding a motion to

6  transfer, the Court may consider undisputed facts outside of

7  the pleadings such as affidavits or declarations.  The

8  information that Mr. Ravel was presenting in support of his

9  case are all disputed facts.  We have a disagreement regarding

10  whether or not the individuals who are at NXP have knowledge.

11  Their present involvement, Your Honor, I don't know, but I

12  believe and plaintiff believes that they have knowledge and

13  information that would be important, that is important to this

14  case based on the information that we have at this time.  Their

15  involvement I think is immaterial.  And if you'll note the

16  declarations from Mr. Dachs, very careful.  They're not

17  involved.  Not involved.  He doesn't say knowledge.  Doesn't

18  say information.  Helpful information, testimony that would go

19  to the critical issue.  That is important to me in terms of our

20  position.  And the law in Weatherford makes it clear the Court

21  can consider facts outside of the pleadings, and the pleadings,

22  Your Honor, is complaint in the answer and no one's disputing

23  that this is a proper jurisdiction, that this is a proper

24  venue.  The allegations of the complaint must be accepted as

25  true, and they're not disputing that this is a proper venue,

1  not a proper jurisdiction because they cannot.  They're relying

2  on convenience.  So the pleadings are true.  The undisputed

3  facts outside of the pleadings such as the affidavits and the

4  corrections the Court should consider, but if there is a

5  factual dispute, those factual disputes should be resolved in

6  favor of the non movant.  We have a dispute as to whether or

7  not certain witnesses are relevant based on our information at

8  this time.  Their rebuttal of it by saying that they're not

9  involved doesn't necessarily resolve the issue.  So under those

10 circumstances I think we feel very comfortable standing where

11 we are.

12         THE COURT:  Well, let me try it like this.  Give me one

13 second to find what I need.

14         Let me try it like this:  I'm not going to do this for all

15 of them, but on Page 13 of y'all's presentation you list the

16 third party witnesses that you believe might be involved from

17 NXP -- let's start -- let's just take up because he's first on

18 your list.  Mr. Kenny Huang, H-u-a-n-g.  What is it that you

19 believe -- why is it you believe he would be a third party

20 witness here?  And I don't -- I'm trying to be delicate.  You

21 might have attorney work product issues about telling me why

22 that is that you -- but in fairness to Apple in this case, I

23 mean, they've put on evidence that -- or they put on an

24 affidavit saying Mr. Huang doesn't belong on this list and I

25 think it's fair to ask you why he does.

1          MR. WALDROP:  Thank you, Your Honor.

2          THE COURT:  At least a little specificity.

3          MR. WALDROP:  Thank you, Your Honor.  If you turn to Slide

4    15, we lay out what we believe is some of the information that

5    supports that.  We have a printout from Mr. Huang's LinkedIn

6    page.  So this is information that he provides to the world

7    about what he's doing, and there's a highlighted section, Your

8    Honor, on the top left where Mr. Huang describes himself as a

9    software engineer in microcontroller solutions and he

10   specifically says that he programmed point of sale reader

11   solution featuring a secure ARM M4 MCU, secure pin entry

12   keypad, NFC, chip reader, external flash, FreeRTOS, certified

13   EMVCo Level 1 and 2 contact and contactless stacks.

14         These are his words about what he has information.

15   Relevant to, as you know, point of sale will be an important

16   thing discussed in this case.  And NFC, as you know, Your

17   Honor, will be critical to Apple's case and our case.  This is

18   information Mr. Huang provides.  This is not something we made

19   up.  This is not something that we're asserting.  This is

20   directly from Mr. Huang.

21         Similarly, Your Honor, Mr. Ran Tang on the same slide --

22         THE COURT:  Let me just for my court reporter.  The name

23   is Ran, R-a-n, and Tang is T-a-n-g.

24         Go ahead, please.  Thank you.

25         MR. WALDROP:  Similarly, this is another NXP engineer in

1  Austin in the Western District of Texas who also lists his

2  information in terms of what he did in 2016 at NXP, and he

3  lists as a bullet here, simplified secure IoT deployment demo

4  with NFC tap to pair.

5      These are Mr. Tang's words about what his relevant

6  information is.  I'm sure we would -- will expand on that and

7  that will be relevant to the facts of this case.

8      THE COURT:  And would you put into the record how NFC, how

9  that relates to the allegations in the patent case?

10     MR. WALDROP:  Yes, Your Honor.  This is near field

11 communication.  Near field communication relates to how the

12 contactless cards are able to relate to application programs,

13 and point of sale devices and the ability to send that

14 communication in the context of a wallet application is

15 critical.

16     If I could direct the Court's attention for purposes of

17 the record to Slide No. 2.  We discuss the patents-in-suit or

18 the patent-in-suit, the '125 patent, relates to managing

19 virtual cards stored on mobile devices and specifically the

20 ability to provision contactless cards on a mobile device, and

21 the NFC microcontroller is important in this case because it

22 allows for the management of the communication protocol between

23 the application program and the point of sale, Your Honor.

24     THE COURT:  Anything else you'd like to add just generally

25 about -- for your argument?

1    MR. WALDROP:  Have I addressed the Court's questions?

2    THE COURT:  You have absolutely.

3    MR. WALDROP:  There was only one other thing I have to

4  point out in the -- regarding the localized interest factor

5  that you and Mr. Ravel were discussing and the Uniloc case the

6  Court said -- specifically Judge Yeakel says the proof shows

7  that Apple has a substantial presence in this district and has

8  a local interest in this case.  I think that is equally

9  applicable here.  There is a substantial presence and Apple has

10  a local -- this -- there's a local interest in this case.  I

11  don't think that can be disputed.  In the Uniloc case, Your

12  Honor, as you identified, it was a foreign plaintiff.  Here we

13  have a plaintiff that has been here since -- in Texas since

14  2004 and in Austin since 2012.  Your Honor, frankly I

15  understand, having been on the defendant's side in motions to

16  transfer in this context, but from our perspective this is the

17  place which is clearly the most convenient for all parties

18  involved, the plaintiff, the defendant and relevant third

19  parties, Your Honor.  We respectfully ask that Apple's motion

20  to transfer be denied.

21    THE COURT:  Thank you, sir.

22    MR. RAVEL:  As the movant, may I have five sentences and

23  sur surrebuttal?

24    THE COURT:  You can have as much time as you want,

25  Mr. Ravel.

1    MR. RAVEL:  Am I going to get the last word along with the

2  burden?

3    THE COURT:  You know, I tend to let everyone go as long as

4  they -- if you say something that so inspires Mr. Waldrop that

5  he wants to say something, I'll let him, and then if that

6  inspires you to say something, I'll let you and we'll just keep

7  going until I --

8    MR. RAVEL:  Forever.

9    THE COURT:  -- I can't stand it anymore.  But certainly

10  you're welcome to go now.

11    MR. RAVEL:  Your Honor, I'm going to speak about the folly

12  of allowing LinkedIn testimony to trump sworn testimony.

13  There's no authority for the proposition that the pleadings are

14  evidence not in the transfer context.  Evidence is evidence.

15  And you get to weigh -- have to weigh the quality of that

16  evidence, and the real folly is that we give you sworn

17  testimony in rebuttal about what Mr. Huang and Mr. Tang do.

18  Then they show you the slides in surrebuttal, and from the face

19  of those slides they have nothing to do with this case.  On

20  Huang, point of sale has nothing to do with this case.  It's

21  putting the credit card on the phone, not using it to buy

22  something.  And on Tang, NFC tap to pair.  We're not here

23  tapping our phone at the Starbucks.  So that's why in this

24  context evidence is evidence.  I think if LinkedIn can trump

25  sworn testimony -- I don't want to be an alarmist here, but I

1   think it's going to be pretty hard for a movant to ever win a

2   transfer.  If low quality evidence is allowed to trump high

3   quality evidence, I think there's trouble there, Judge, and

4   Apple would ask you to weigh the quality of the evidence each

5   way and make the appropriate findings because there's no

6   question that you make findings on the elements, and findings

7   can only be based on evidence.  And inferences from weak

8   evidence can't trump direct declarations from strong evidence.

9        THE COURT:  Anything else, Mr. Waldrop?

10       MR. WALDROP:  Just quickly, Your Honor.  I'll get in

11  trouble if I don't at least point this out because this was

12  found on Slide 10, Your Honor.  We point out something that I

13  think is relevant regarding that Apple has a hardware division

14  with at least 500 employees here in Austin.  Mrs. Kim found

15  this so I'll get in trouble unless I make sure I bring it to

16  the Court's attention.  It's on Slide 10.  And it's undisputed

17  that Apple employees in this district design chips that go into

18  all devices that Apple sells, and this is hundreds of millions

19  of devices every year, and that's a direct quote from Apple's

20  senior vice president of hardware technology John Srouji who's

21  a VP.  That hasn't been disputed, Your Honor, and we think that

22  is an individual that we will likely talk too.  So this idea

23  that the Austin office is somehow separate from the accused

24  functionality in this case is wrong.  Mobile devices are

25  relevant and will be talked about a lot and are mentioned in

the infringement contentions, and so I just wanted to make sure I pointed that out directly.

Also, Your Honor, Mr. Ravel talks about sworn testimony. There is no sworn testimony from Mr. Huang or Mr. Tang who we believe have relevant information. There is no declaration from them whereby they're denying or disclaiming their relevant information in NFC, and I think the reason there isn't because they can't. I do think they have relevant information. And regarding low quality or high quality evidence, I've never heard such a term before. What we have presented is what we believe is sufficient to defeat their burden. They have the burden. The burden's not on us. They have a burden. It is a high burden. We have presented evidence in a good faith basis that can be easily reviewed by the Court, weighed by the Court to determine whether or not they met their burden. I believe the way that they can meet their burden they have failed to do so, and the way to do that is to identify specifically clearly third party witnesses outside of the district that are outside the subpoena power of the Court. For whatever reason, they didn't do that, but that to me would have been the most compeling way that they could have defeated this. They have not done that.

Additionally, Your Honor, Fintiv is saying that there are factual disputes that must be decided in the non movant's favor. Apple is saying that as a matter of law Apple's facts

1   are correct.  So what they say is correct.  What we say is

2   wrong.  I don't know of any legal position to support that.

3   We're just saying that there are disputes regarding the

4   information and the factual record that resolves in our favor,

5   and I don't think they can support that as a matter of law that

6   their facts are correct.

7        And with that, Your Honor, I conclude my presentation.

8   I'm very appreciative of the time and consideration you have

9   given us and we request again that Apple's motion to transfer

10  be denied, Your Honor.

11       MR. RAVEL:  Your Honor, I'm going to waive the white flag

12  first.  I don't have anything further.

13       THE COURT:  Remind me when the Markman's set.  November I

14  think?

15       MR. JENSEN:  November sounds correct.

16       THE COURT:  That's fine.  We'll get a decision out very --

17  hopefully in the very near future about what we're going to do.

18       Is there anything we need to take up with respect to any

19  other issues?

20       MR. WALDROP:  No, Your Honor.

21       MR. RAVEL:  Point of agreement.  No.

22       THE COURT:  Very good.

23       MR. WALDROP:  We agree on a lot.

24       THE COURT:  Okay.  We'll get this order out.  Hopefully

25  it'll be very soon.  I don't know exactly when, but if we can

1  get it done next week, we will.  And so I certainly -- if the

2  case should be transferred, it should be transferred quickly,

3  and if it isn't going to be transferred, you all should know

4  that quickly as well.  So I'll do my very best.  It's

5  certainly -- y'all will not be sitting there the week before

6  the Markman wondering if it's going to be transferred or not.

7  So we'll get to it more quickly than that.

8        Thank you very much.  Have a wonderful weekend.

9        (Hearing adjourned at 11:17 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS    )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10 United States.

11      Certified to by me this 4th day of September 2019.

12

                              */s/ Kristie M. Davis*
13                            KRISTIE M. DAVIS
                              Official Court Reporter
14                            800 Franklin Avenue, Suite 316
                              Waco, Texas 76701
15                            (254) 340-6114
                              kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25